```
         IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF OHIO
                   EASTERN DIVISION
```

Kelly Sue Gerber,                :

    Plaintiff,               :

  v.                             :      Case No. 2:14-cv-473

Commissioner of Social Security,
                               Magistrate Judge Kemp
    Defendant.               :

OPINION AND ORDER

I. Introduction

Plaintiff, Kelly Sue Gerber, filed this action seeking review of a decision of the Commissioner of Social Security denying her application for disability insurance benefits. That application was filed on January 28, 2010, and alleged that Plaintiff became disabled on September 10, 2009.

After initial administrative denials of her claim, Plaintiff was given a video hearing before an Administrative Law Judge on October 18, 2012. In a decision dated November 19, 2012, the ALJ denied benefits. That became the Commissioner's final decision on March 24, 2014, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on August 1, 2014. Plaintiff filed a statement of specific errors on November 6, 2014, to which the Commissioner responded on January 25, 2015. Plaintiff did not file a reply brief, and the case is now ready to decide.

II. Plaintiff's Testimony at the Administrative Hearing

Ms. Gerber was 42 when the administrative hearing was held. She is a high school graduate who completed two years of college but did not get a degree. She testified to the following at the administrative hearing (see Tr. 41-69).

Plaintiff said she had not worked since September of 2009. Going back to 1997, she had worked as a video store manager, as a desk clerk and assistant general manager/sales director at a hotel, as a parts inspector in a factory which made automotive parts, as a Wal-Mart cashier, as a package scanner, and again as a hotel clerk. While working that job, she developed both personal and physical problems, and she was diagnosed with Raynaud's syndrome and lupus.

Plaintiff had surgery for carpal tunnel syndrome in 2010. She had some temporary relief but still experienced problems with numbness and grip strength. She had pain from a sciatic nerve problem and suffered numbness in her right leg. She also had blackouts in her left eye, occurring three or four times per week. They coincided with headaches. She was seeing three doctors on a regular basis: a primary care physician, a doctor for arthritis, lupus, and fibromyalgia, and one for migraine headaches.

The ALJ asked Plaintiff if she could do a job that allowed her to move around and not lift or carry. She said that visibility would be a limiting factor, as would side effects from medication, including nausea and drowsiness. During a normal day, Plaintiff would help her children with their homework and assist in some household chores, but she could not stand longer than eight or ten minutes or sit for more than fifteen or twenty minutes at a time. Her lupus caused her hands, feet, and ankles to stiffen and swell, and back spasms interrupted her sleep. She typically would lie down several times in a day. Finally, she had shortness of breath and used an inhaler several times a day.

### III. The Medical Records

The medical records in this case are found beginning on page 251 of the administrative record. They are voluminous, as illustrated by the 18-page summary of them found in Plaintiff's

Statement of Errors. The Court will focus its discussion on the records which pertain to Plaintiff's three assignments of error (headaches, upper extremity limitations, and certain opinion evidence).

### A. Headaches

Plaintiff was seen at Hilliard Rome Family Medicine on September 8, 2009. She reported anxiety, heart palpitations, and right shoulder and back pain, for which she had sought treatment at the emergency room several weeks before. The examiner's notes state that she also had headaches three or four times per week, and headache was among the diagnoses. (Tr. 512-13). That appointment occurred two days before the alleged onset date of disability.

Many of the treatment notes in the following months deal with Raynaud's phenomenon, based on Plaintiff's report of burning sensations and discoloration of her toes and feet. She also underwent some testing for lupus. In connection with that effort, she reported to Dr. Gray, a rheumatologist, that chronic headaches were among her symptoms (along with fatigue, weight gain, night sweats, cold sensitivity, thinning of her hair, mouth sores, dry mouth, loss of appetite, heartburn, nausea, tingling, and numbness). It did not appear she was taking any headache medications. (Tr. 456-57).

Plaintiff had a great deal of medical treatment after that date for her Raynaud's and for an embolism in her leg, among other things. Generally, she did not report headaches or seek treatment for them. In connection with seeking treatment for neck pain in February of 2011, she did describe headaches with temporary loss of vision, but she attributed them to the neck pain. A CT of the brain was ordered. (Tr. 439). At a follow-up visit, Plaintiff reported getting headaches less frequently, noting that the pain was more in her neck. (Tr. 443). When she

asked for a disability form to be filled out in April of 2011, she identified her disabling illnesses as lupus, Raynaud's, and low back pain. She had also missed a neurology appointment for her headaches. (Tr. 446).

    The next mention of headaches in the medical records appears to be an emergency department note from June, 2011. Plaintiff presented with a complaint of right shoulder and neck pain as well as a headache, and she reported a history of migraine headaches. A CT scan was ordered and completed, which was unremarkable. (Tr. 652-54). Three months later, Plaintiff continued to report headaches with vision loss, although she said it only lasted for a few seconds. (Tr. 600). Two weeks after that visit (i.e. September 21, 2011) she was still having problems with transient worsening of vision and headaches, but according to the treatment note, "she has not lost her vision for more than a few secs anytime & her headache is dull aching." (Tr. 597). But only eight days later, she told a different doctor that she had had migraines for fifteen years and recently had episodes where she lost the vision in her left eye for five to ten minutes at a time. A carotid Doppler study was done, which was normal. Dr. Hamilton, the examining physician, ordered an MRI. (Tr. 580-84). That was subsequently done and was normal. Dr. Bozkir suggested that the cause was retinal migraine and he recommended that Plaintiff keep a diary of symptoms. (Tr. 585).

    Plaintiff saw Dr. Bozkir again on January 9, 2012, and reported that, according to her diary, she had had a headache every 2-3 days since November. He did not find any ocular cause for the headaches and recommended that she see her family doctor for treatment. (Tr. 715). Another physician, Dr. Black, speculated that the right occipital trigger point might be causing some of her headaches. (Tr. 668-70). There do not

appear to be any additional records containing significant information about this medical issue, except that in a number of other medical notes, language such as "no headache" appears when Plaintiff's systems and symptoms were reviewed.

B. Upper Extremity Pain

Most of the records relied on by Plaintiff concerning this impairment deal with either right shoulder pain or numbness and loss of grip strength in the right hand. She told the consultative examiner, Dr. Winkle, that she had swelling in her hands, wrists, and fingers, brought on by repetitive hand movements among other things. Her carpal tunnel surgery had improved the numbness she used to experience in her wrist, however. No swelling was evident during the examination and her strength was normal. Dr. Winkle did not suggest any limitations on the use of her hands. (Tr. 263-65).

The balance of the records consist of Plaintiff's report to various physicians, or the emergency department, that she had either right shoulder pain or swelling of her hands. There are also notes indicating a full range of motion in all joints. However, Dr. England did note, on several occasions, that Plaintiff had synovitis of both elbows and that Plaintiff had "[f]ull range of motion of upper and lower extremities but painful." (Tr. 725). Finally, as Plaintiff points out, Dr. Congbalay, a state agency physician, completed a physical residual functional capacity assessment which, while it did not limit Plaintiff in pushing and pulling with her arms, limited her to only frequent gross manipulation with the right hand. She noted, in her comments, Dr. Winkle's finding that Plaintiff had pain on extension of her right wrist. (Tr. 358-65).

IV. The Medical Testimony

Dr. Lee Fischer testified at the administrative hearing as a medical expert, beginning at Tr. 70. His testimony can be

summarized as follows.

Dr. Fischer identified Plaintiff's primary problems as connective tissue disorder, possibly lupus, Raynaud's phenomenon, bilateral hearing loss, hypertension, chronic low back pain, carpal tunnel syndrome, headaches, fibromyalgia, obstructive sleep apnea, and COPD.  Obesity contributed to some of her problems.  Together, these impairments limited her to working in a clean air environment, and they prevented her from ever kneeling, crouching, or crawling, but she could occasionally climb stairs, bend or stoop.  She could not be on ladders, ropes, or scaffolds.  Additionally, she should avoid temperature extremes and unprotected heights and could work only at the sedentary exertional level.

### V. The Vocational Testimony

Robert Breslin was the vocational expert in this case.  His testimony begins at page 76 of the administrative record.

Mr. Breslin first testified that Plaintiff's past relevant work, as she testified to, included jobs at the sedentary and light exertional levels, and was either skilled or semi-skilled.

Mr. Breslin was then asked to testify about a hypothetical individual who had a number of physical limitations and, in addition, could do a range of tasks without specific production requirements or frequent changes in the job routine.  He responded that none of her past jobs would allow for that limited type of standing and the performance of only unskilled tasks.  However, such a person could work as an unskilled assembler or inspector at the sedentary level.  If she had headaches as frequently as she testified and also had to nap daily, she could not work.

### VI. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 14-30 of the administrative record.  The important findings in that

decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured requirements of the Social Security Act through June 30, 2014.  Next, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of September 10, 2009.

Going to the next step of the sequential evaluation process, the ALJ determined that Plaintiff had multiple severe impairments including a connective tissue disorder generally diagnosed as lupus, Raynaud's phenomenon, obesity, chronic obstructive pulmonary disease, chronic low back pain secondary to degenerative disc disease of the thoracic spine, and depression. The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to step four of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform work at the sedentary exertional level.  However, she could not climb ladders, ropes, or scaffolds and could not kneel, crouch or crawl.  She could occasionally climb stairs, bend, and stoop.  She could not tolerate concentrated exposure to respiratory irritants and had to avoid extremes of temperature and unprotected heights.  Lastly, she could do only jobs which did not have strict production quotas or frequent changes in the work routine.

The ALJ next concluded that Plaintiff, with these limitations, could not do any of her past relevant work. However, Plaintiff could do the assembler and inspector jobs identified by the vocational expert.  The ALJ further found that these jobs existed in significant numbers in both the regional and national economies, there being 135 such jobs regionally and 196,000 nationally.  Consequently, the ALJ concluded that

Plaintiff was not entitled to benefits.

VI. Plaintiff's Statement of Specific Errors

Plaintiff raises these issues in her statement of errors. First, she argues that the ALJ did not have substantial evidence to support the finding that her headaches were not a severe impairment. Second, she asserts that the residual functional capacity finding is not based on substantial evidence because it omitted any mention of upper extremity limitations. Third, she contends that the ALJ erred by failing to discuss some of the opinion evidence. These contentions are reviewed under the following legal standard.

Standard of Review. Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" Id. LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's

decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

### A. Headaches as a Severe Impairment

The evidence concerning Plaintiff's complaint of frequent headaches, accompanied by temporary loss of vision, is summarized above. The ALJ did not find Plaintiff's headaches to be a severe impairment. The ALJ did so on the basis that "there is no objective medical evidence to support her claims" and because Plaintiff skipped one neurological consult, denied headaches at various times, had normal neurological findings on tests, and her doctors commented that there was no reason they could detect for her vision loss. Also, the ALJ referred to Dr. Fischer's testimony that the records did not support Plaintiff's allegations and that she did not take medications normally prescribed for migraines. (Tr. 18-19). Plaintiff argues that these reasons are either a mischaracterization of the record or are not reasonable inference that can be drawn from the medical records.

The Commissioner first argues that the failure to find Plaintiff's headaches to be a severe impairment is inconsequential because the ALJ found other severe impairments to exist. That argument has force, however, only when the ALJ, despite finding a particular impairment to be nonsevere, still takes some functional limitations arising from that impairment into account when determining a claimants' residual functional capacity. See Maziarz v. Secretary of Health & Human Services, 837 F.2d 240, 244 (6th Cir. 1987). That did not happen here. Alternatively, the Commissioner argues that the evidence cited by the ALJ is drawn from the record and supports the finding that Plaintiff's headaches were not severe.

There is certainly evidence in the record to support a finding that Plaintiff's headaches imposed more than an

-9-

insignificant limit on her ability to work, especially if her testimony as to the frequency and effect of her headaches were credited.  However, that is not the relevant question.  The Court does not reweigh the evidence presented to the ALJ, but rather must determine only if a reasonable person could, reviewing that evidence, reach the same conclusion as the ALJ.

Here, the Court finds that the evidence in the record can support a reasonable inference that Plaintiff's headaches did not impose significant limitations on her ability to work.  She did miss the first neurological appointment after complaining of headaches to her family doctor, which could lead a reasonable person to conclude that the problem was not as severe as she claimed.  She reported on a number of occasions, although it was to doctors who were treating her for other conditions, that she did not have headaches.  That is entitled to be given some consideration.  No medical test showed a specific cause for her headaches, and the suggestion that they might be related to an occipital trigger point was only that - a suggestion.  Dr. Fischer, the medical expert, pointed out that the record did not show that Plaintiff was taking medications typical of migraine sufferers.  Although headaches may, as Plaintiff argues, typically be diagnosed based on subjective reports of symptoms, the factors relied on by Dr. Fischer were entitled to be given some weight by the ALJ.  Finally, Plaintiff's reports of the frequency and severity of her symptoms differed, even when made in roughly the same time frame, something which casts some doubt on the reliability of her testimony.  In fact, the ALJ made a finding that her complaints, including her description of debilitating headaches, were not entirely credible, and Plaintiff has not directly challenged that finding.  While a reasonable person could have concluded, given this evidence, that Plaintiff's headaches imposed some functional limitations, the opposite conclusion is also permissible.  When that is the case,

the ALJ's decision cannot be overturned by a reviewing court. See, e.g., Kalmbach v. Comm'r of Social Security, 409 Fed. Appx. 852, 859 (6th Cir. Jan.7, 2011)("If substantial evidence supports the ALJ's conclusion and the ALJ applied the correct legal standards, we are not at liberty to reverse the ALJ's decision even if substantial evidence exists in the record that would have supported an opposite conclusion"). Consequently, the Court finds no merit in Plaintiff's first statement of error.

                        B.   <u>Upper Extremity Limitations</u>

Plaintiff's argument on this point is similar to her argument about headaches. Again, she notes the presence of medical evidence (which the Court has summarized above) showing that she reported various issues with her hand, wrist, and shoulder, and that various doctors concluded that she was limited to some degree by these impairments. She argues that the ALJ was required to impose limitations on reaching, handling, fingering, and feeling, and that the failure to do so is cause for remand. In opposition, the Commissioner asserts that the record simply does not support any manipulative limitations, especially given a number of normal neurological examinations and the fact that Dr. Winkle did not impose any such limitations as a result of his findings.

The ALJ made the general statement (Tr. 24) that the vast majority of examinations showed full range of motion and full strength in all Plaintiff's extremities. The ALJ also noted that Dr. Congbalay had, based on Dr. Winkle's examination findings, imposed postural, manipulative, and hearing limitations, but stated that "the medical evidence does not support postural or hearing limitations." (Tr. 27). The ALJ did not specifically discuss the manipulative limitations found by Dr. Congbalay other than to say that Plaintiff's carpal tunnel syndrome had resolved and that she had full range of motion, full strength, and normal reflexes, sensation, and coordination in her upper extremities.

<u>Id</u>.  She did not mention Dr. Winkle's separate finding of pain on extension of the right wrist or swelling of the hand and wrist brought on by repetitive movements, nor the comment that Plaintiff's range of motion studies, though normal, did produce some pain.

The ALJ is not, of course, required to discuss every single item of evidence in her decision.  Further, because there is no treating physician opinion in this case dealing with manipulative limitations, the ALJ was not required to articulate her findings about such limitations in any particular fashion.  The Court's duty, in reviewing a decision about limitations arising from a specific impairment, is to ensure that the ALJ actually considered all of the pertinent evidence, even if it was not all cited, and that the ALJ's ultimate determination has substantial support in the record.  <u>See Karger v. Comm'r of Social Security</u>, 414 Fed. Appx. 739, 753 (6th Cir. Feb. 10, 2011)(the ALJ must "discuss enough [ ] evidence to enable [a reviewing court] to determine whether substantial evidence supports the [ALJ's] determination...").

Dr. Congbalay was the only physician to express an opinion that certain manipulative limitations existed.  She relied on Dr. Winkle's report, which, in turn, relied to some extent on Plaintiff's subjective report of swelling caused by repetitive movements (no swelling was noted on the day of the examination), and, as noted above, the ALJ found Plaintiff not to be fully credible.  Dr. Fischer, who reviewed the same records as Dr. Congbalay and additional records as well, did not testify to any manipulative limitations.  There are records showing normal range of motion in the upper extremities.  Consequently, while a more detailed discussion of some of the evidence about shoulder pain or synovitis might have been helpful, the absence of that discussion does not convince the Court either that the ALJ completely ignored that evidence or that she did not have a

reasonable basis for concluding that Plaintiff had no manipulative limitations. Consequently, the Court finds no merit in Plaintiff's second statement of error.

### C. The Opinion Evidence

Plaintiff's final claim is that the ALJ did not properly consider all of the opinion evidence. The two items of opinion evidence to which she refers are a statement from a nurse practitioner at OSU Ross Heart Hospital to the effect that Plaintiff should remain off work until further notice and a statement found in the Hilliard Rome Family Medicine notes indicating that Plaintiff experienced back spasms if remaining in one position for too long. The ALJ did discuss opinions from Hilliard Rome Family Medicine in general but not this specific finding. The Commissioner responds that the ALJ did not have to assign weight to the opinion of a nurse practitioner and, even if she should have, that opinion was not supported by the record because there is no evidence that Plaintiff had a severe cardiac impairment. The Court finds this latter assertion to be correct and will not devote any further discussion to the nurse practitioner opinion.

As to the other opinion, the Commissioner argues that it was entitled to little weight, essentially claiming that the ALJ's failure to discuss this specific portion of the opinion is harmless error. The Court agrees. No other doctor (assuming that the opinion in question was rendered by a doctor, which is not entirely clear) suggested that Plaintiff's back pain was so severe as to preclude even sedentary work. There are no records to support that conclusion, and another opinion rendered by the same group of physicians only a month before did not include this limitation. All of the other opinion evidence, including the testimony of Dr. Fischer, was to the contrary. It seems clear that a remand for a more specific finding as to this single piece of evidence would have no chance of changing the ultimate result

-13-

in this case.  Consequently, even if the ALJ made a technical error in not assigning specific weight to this opinion, that error was harmless.  As a result, the Court finds no merit in this last statement of error.

### VII.  Decision

Based on the above discussion, Plaintiff's statement of specific errors (Doc. 16) is overruled and the Clerk is directed to enter judgment in favor of the defendant Commissioner.

/s/ Terence P. Kemp
United States Magistrate Judge